Attara. So, Mr. D'Angelo, who's going to argue? Yes, sir. And you know, to keep an eye on the lights, when they turn yellow, you wind down. When it turns red, you finish that sentence. Don't start another sentence. May it please the court. My name is Carlo D'Angelo and I will be addressing the sufficiency of the evidence issue as far as it applies to the conviction in this case and the multiple conspiracy issue. Counsel for Mr. Pineda will be also addressing a sufficiency as it applies to his client, the dollarization issue with respect to intent in this case and the suppression issue. Counsel for Rojas will be addressing sufficiency as it applies to conspiracy to and his client. And finally, counsel for Petrago will be addressing the issue of jurisdiction venue and insufficiency. That's a lot of lawyers for not much time, so you better get going. Thank you. With respect to my portion of the argument, Your Honor, I'd like to focus the court with respect to the issue of government overreaching in this case. What the government has essentially done in this case is they have overreached under the premise that they can prosecute international crimes if they have an impact upon the United States. However, in the trial evidence that was offered in this case, there was no such impact. Now, we made several arguments regarding the government's overreaching in this case. We argued quite strenuously that the government lacked any Is your overreaching argument a constitutional one or a statutory one or one of deficient evidence? And with the court's pleasure, that's where I'd like to focus my arguments unless the court has any jurisdiction concerns. The overreaching that we see in this case touches upon the issue of knowledge and intent. The precedent is very well established that in order for a crime to impact the United States, especially an importation of narcotics case, there has to be some evidence that there was an impact with respect to intent or knowledge that the narcotics or knowledge or knowledge, the jury instruction argument about it has to be both. You're not pressing that. The case law appears to support the notion that the government can plead the case with respect to this in a district. They can prove their case in a disjunctive fashion. So what I got is U. S. Dollars, a massive organization involving transportation north south but never getting into the U. S. Correct. But as to your client, it's undisputed, I think, that he travels eventually all the way to the Zeta, whatever one would call it, property right next to the U. S. border. Why wouldn't they be able to infer that if he knows he's got to go apologize and explain to them right there that the drugs were heading into the U. S.? That's exactly our point in this case. This case is built upon a house of cards of impermissible inferences. As the court is well aware, an inference is using one inference to prove another. That's exactly what the government did in this case. The simple fact that this defendant traveled to the border town, while it is indicative that he entered Mexico, again, there is no direct evidence linking the cocaine in this case to the United States. Instead, what the government did is they foisted upon the jury a theory that because the Mexicans paid for the cocaine in U. S. Dollars, that that must be evidence of intent. They then offered a bunch of expert, quote-unquote, expert witnesses who were convicted drug traffickers, who all opined that when cocaine leaves Colombia and goes to Central America, that it goes to Mexico and over the border. However, none of the defendants in this case... It's a lot more valuable in dollars than it is in Mexican pesos, right? There is certainly a higher value in the United States. Is it your position that the cocaine was to remain in Mexico? Well, that is the issue that the government was never able to prove in this case definitively. They rely on case laws... They weren't going to prove it was going to remain in Mexico. But they had to prove that there was an intent to bring it into the United States. Or an inference, yes. The sort of evidence that really frustrated the defendants in this case was that they tried to foist these inferences based upon discrete episodes. For example, in the briefs, we've cited an incident with respect to some discussion of moving cocaine to McAllen. A cooperating defendant in this case testified. But put that aside, because the McAllen wasn't charged. But if I remember, is it Ferguson and Scott, those are the two experts? Yes. And they specifically state that it's all going to the U.S. Now, that doesn't go to the state of mind of your client. Correct. But from that type of expert testimony, a jury could infer, or would you say they couldn't? We would submit that no reasonable jury could infer that based upon completely speculative testimony. But that's an evidentiary objection to the experts. But it came in. Once it's in, the jury, from the standpoint of a sufficiency argument, what's your best case that the jury can't make that inference? Because those inferences were based upon other inferences. In other words, the government... What's your best case? Our best case is that the dollarization was the strongest, and the fact that the government leaned on the heaviest What's your best case that a jury can't make an inference from expert testimony if you're not arguing the evidentiary error? And I'm thinking, I think it's Judge Kavanaugh's decision in Martinez in the D.C. Circuit, which it looked like just exactly that happened. I think that the Court is very well, is correct with respect to that Martinez decision. What we would submit, however, is that there is a long line of precedent which suggests that if inferences are based upon other inferences, in other words, if an inference is accepted on its face... What's your best case for that proposition? I'll be happy to file a Rule 28 with respect to that issue, Judge. I can't retrieve one at this exact moment, but I'll certainly... Isn't it also true that, I may mispronounce the names, but the cooperating co-conspirators Angel and Estupion? Your Honor, yes. Didn't they both also say, even on cross-examination, it's coming to the United States? Unfortunately, they did. However, again, this is expert testimony that... That wasn't expert testimony. Well, this is co-conspirator testimony because of the nature of the admissibility of the evidence. But again, it's speculative because that defendant, although the government tried very hard at the eleventh hour to take what was announced as extrinsic evidence and tried to make it intrinsic to this conspiracy, it was based upon very dubious credibility because it was double hearsay. It was the testimony of Mr. Estuponian testifying about what his partner, who did not testify at trial, had said was the objective of this cocaine, that it was to go to Mexico. But however, again, that's an implausible inference because... Or at least it's an unreliable inference because what they are saying is the cocaine was going to Mexico. We don't know where it was going from Mexico. Again, the government is expecting the jury to bridge that gap based upon a series of inferences, which we would submit as, frankly, unjustified. I believe my time has expired. I should help hand off to the next counsel. That's what happens when you share. Thank you, Your Honor. All right. Mr. Kretzer. Good morning, Your Honor. Seth Kretzer for Appellant Panetta. I have four points I'd like to make, so I'll try to get to them very quickly. I'd like to start, Judge Higginson, with expounding a little bit on the question that you had posed towards the end of Mr. D'Angelo's questioning, which was the impact of the testimonies of the co-conspirators about the drugs. There is no doubt I'd ask you to look at the testimony of Comatine, the testimony of Gomez-Gonzalez. That starts at 2646. The testimony of Vazquez-Angel at 2987. There's a lot of them, so I won't name them all. The problem, Judge Higginson, that we have with their testimony is that, yes, they were asked, do you understand that generally drugs are imported into the United States? And they said, yes, that's how things generally work. That may be how things generally work. The opening part of the government's brief says basically, you know, it's an old story, drugs going north, money going south. The evidence to me is not a sufficient evidentiary indicia that these particular drugs were going to the United States. And every one of these witnesses was cross-examined. Do you know these people sitting at this defense table? No. Or if you know them, do you know anything about these drugs in particular? No. When Byron, this is one of the emissaries who was sent from Colombia up to Mexico, all he knew was he was there to await a drug shipment coming from his boss. He had no idea what it was going to go on after that. I would argue, Judge Higginson, that by analogy to a very well venerable legal precept, that mere buyer-seller relationship does not establish evidence of intent to distribute. If the government wants to show intent to redistribute, they have to bring some additional evidence. The division of labor in this case, Judge, bear in mind we're down here in Colombia, thousands of miles away from the United States, was that pilots like my client only knew they were moving a set of narcotics from point A to point B, a very short distance, Colombia to Panama or Colombia to Honduras, like here to Dallas. They were never told what was going to happen after that. Judge Clement, I have no doubt that you're correct that drugs are worth more in the United States than they might be somewhere else. And there's expert testimony that a number of times drugs do come to the United States, and yet drugs go all over the world. And without that additional evidentiary indice, which the government is tasked beyond a reasonable doubt with proving, we submit the evidence was insufficient here. That, I think, melds into my next point, which is about the dollarization issue. We pointed out, Judge Angelo and I, in our brief, I think we cited this in our statement request for the United States, saying that dollars alone are sufficient to predicate intent to distribute to the United States. What about dollars plus an organizational structure like this? Your client's the pilot of that HP-1607, right? That's right. He was the one, although he was only found... But if you've got planes going across countries, and you've got the amount involved plus dollarization, plus sort of co-conspirator visits right to the border town where the Zetas are, they're not going to use the word United States. It's so sophisticated. That's like, I don't think the tapes have them using the word cocaine, right? 20,000 wiretaps, not one said anything about United States. I know, but you offer that as sort of exculpatory, but that just proves the sophistication. In those wiretaps, do they ever say cocaine, or do they talk about doctors and medicine and hospitals? Different people will say different things. There certainly was some talk about doctors and hospitals. They know the U.S. laws, and prisons are... Of course, they're not going to say it's going to the United States. I don't know if there's any testimony that any of these folks knew the U.S. laws. They may have known that narcotics was illegal in the respective countries of embarkation. There was certainly no testimony of any of these people in any specific familiar... Not only the legal fiction of the law is knowable, of course. You only got a minute, 30. Yes. Is anyone going to talk about the wiretapper venue, or are you going to let the briefs stand on that? Yes. The next one I'd like to talk... I'd like to hit two issues, just very briefly, if I may, Judge. The first one, I'll get to the suppression last in my remaining time. I would like to also address the Court's attention, even if you move away from just the general issue of intent to import into the United States. There is, of course, our sentencing argument that we argue that that enhancement, that specific offense characteristic requires actual importation. The simple introductory, prefatory clause of that statement requires it. We urge the Court to look at that specifically for no other reason than, of course, the government and I are arguing about 11th Circuit cases. No one can find any 5th Circuit cases on the On the Fourth Amendment suppression issue, Judge Higginson, the evolution of the District Court's analysis of this evolved over time from the Magistrate's report and recommendation to... But it ultimately comes up withstanding, right? That's right. It ultimately says... Verdugo, yes. Verdugo and Hernandez. That's correct, yes. We recognize the authority, the import of Verdugo. We would ask the Court to do two things with regard to that. I think we argue in our briefs a little bit that the Court may revisit Verdugo in the future. Of course, this Court is bound by the holding of Verdugo. There's some scholarly commentary about that. If this Court were to conclude that we didn't successfully distinguish Verdugo as tostanding, we would ask nevertheless that this Court would still go ahead and do an analysis on the joint venture issue, somewhat kind of like when a court in a habeas situation said, I find the claim was procedurally declared. But in Verdugo, the DEA orchestrated everything. That's right, yes.  We would argue, Judge, that because the joint venture issue has become so much more salient over time, because it's no longer just drugs. Obviously, we have operations with foreign intelligence regarding terrorism and so forth, that we might be able to argue in a future cert petition that the Supreme Court should revisit Verdugo. So for that reason, we would ask that you go ahead and do a merits review, even if you were to find that standing was dispositive. You want to stop at that point alone. I know my time is up, so I'll do it. Thank you. All right. Mr. Darden. Thank you, Your Honor. May it please the Court, Judges Clement, Benavides, and Higginson, I'm Todd Darden, and I was appointed to represent Rojas in this case. He's a little different from most of the defendants here. He's from a rural area in Colombia, was born and raised there, never been to the United States, never knew anything about the United States. His wife and his son are waiting for him there. His father died when he was sixteen. He worked to support his mother. Now, the evidence does show that he was working and he was actually involved with a truck that was carrying cocaine, transporting it within Colombia to an airstrip where it was going to fly out of the country. But I think the central issue, the one that we need to look at here, I've tried to address in my reply brief, is, is it against United States law for people in Colombia to export cocaine out of Colombia, or is there a protection that the government has to show that the cocaine or the controlled substance was intended to be imported into the United States? This goes to the universal jurisdiction argument raised by Mr. Kretzer, and again, as the Court notes, I have joined in their brief under Rule 28i. Okay, you've joined in their brief as to that legal argument, but you can't cross-incorporate a sufficiency that would be particular to your defendant, correct? I have my own sufficiency arguments, correct. So the argument you're making now is that 959 and 963 are extraterritorial and beyond Congress's authority? I'm not adopting that. What I'm, what I guess, what I'm trying to say is, goes back to the jury charge and the point that we made there at the trial, which is, my client wasn't, was, the protection for my client is that the government had to prove that he had the intent, or he, knowing that he knew that the cocaine he was involved with, it's a sufficiency argument. You're just saying he lacked the intent and knowledge that these drugs were going to impact or violate the protective principle of the United States, isn't that our, is that your? That it would be imported into the United States. Right, so it's a sufficiency argument. It is a sufficiency argument. Yes, we made a objection to the jury's charge and we made it a, we requested the jury's instruction on that very issue. Okay. Now, one of the things that you'd asked about, Judge Higginson, was what is the strongest case that I have? And I'd like to pick up on that. Probably the strongest case I have as far as an analogy, it would be the Flores-Figueroa case. Now in Flores-Figueroa, there was a man who was a social security worker and needed to provide a social security number to his employer to work. So he picked one out, made up a counterfeit card and turned it in. Well, it turns out it's against the law to use the social security number that belongs to another person and the number that he made up belonged to another person. Now, there's only so many social security numbers out there and there's a whole lot of people that have them. So isn't it very likely that when he picked out a number, it was going to belong to another person? And it did. And wouldn't that be sufficient? And the Supreme Court says, no, it's not. The government has to prove that he actually knew that number belonged to someone else when he used it in order to violate that statute. And that is cited in my brief, my reply brief at pages five to six. What about the sort of core issue of you've got Ferguson and Scott experts saying anyone would have known this amount, this structure would end up in the U.S.? Why would that testimony, and I'm again thinking of the D.C. Martinez decision, not suffice for an inference to be drawn? The Londono case, which is basically distinguished from the Martinez case that the government relies upon, speaks to the fact that if it flies out of Columbia to Panama, it's probably going to Europe because of the boats that go through there. But once it hits the highway, the Pan-American highway, then it's probably coming to the United States. He said it generally, but he also acknowledged that the cocaine goes to other countries as well. And again, the jury asked, they said they wanted to know, can they convict somebody if they don't believe that person knew the cocaine was coming to the United States? That was why we requested the instruction we did, because the government has to show that for each person. I mean, we're all lumped together for trial. That's the way it works. It's efficiency. But my client has the right. His protection is the government has to prove that he knew or he intended for the cocaine that he was involved with to come into the United States. The jury asked a specific question, but I'm assuming the court said, yes, you must individualize and particularize the interest each. If you look at the court's response, it's perhaps, it's in the record and you see it. I take, it was, there were two questions. The court answered one and it did so in a way that it actually kind of inferred that the negative, that the jury could convict even if the court, if the jury did not find that the defendant had knowledge. And so that was problematic. That's why we requested the instruction we initially did. I see my time is up. I'm so sorry. Thank you, Your Honors. Good morning, Your Honor. I'm Don Bailey. I represent Mr. Julio Hernando Moya-Betrigo. The two issues I have is the insufficiency with regards to specifically Mr. Moya. Mr. Moya was the air traffic controller. You know the facts. And at the end of the case, Agent Ferguson testified that all they had, even after the false testimony at the grand jury, the false affidavits, that all they really had was the phone calls. And the phone calls were basically centered on two dates. November 18th, there was 28 phone calls between the dead Mr. Gaitan and Mr. Julio Hernando Moya-Betrigo. And it raised suspicion. There were suspicious phone calls. But do we convict people in the United States based on mere suspicion? And that is what I brought up to Judge Cronin. I thought he spoke in code. They're suspicious phone calls. Okay. But we've got, once you're speaking in code, that's going to be a problematic. I mean, the jury's got an opportunity to infer from that that it's narcotics that's cocaine instead of the hospitals, right? Well, on the November calls, they weren't about hospitals. They were about medicine. But that inferred there was a flight. But as Mr. Agent Ferguson testified, he couldn't testify that there was a flight. He couldn't testify if there was a flight, what was on that flight. That's all they had. The second thing is HP-1607, which flew on December 20th. Mr. Moya had not talked to Mr. Gaitan in eight days previous to that. And as to the court's previous question about, well, can't we infer it was going to the United States, the only citizen from another country that was involved in that flight from 1607 was a Danish citizen who left the same time that flight left from El Dorado Airport. And that's in my brief. And cocaine in Europe is worth twice as much as it is in the United States. So I think that you can make an inference. But how many inferences do we need before we decide that there's got to be, the chain is too long here. So the government says that the evidence is strong against Mr. Moya. I would submit that if you read the record, which you have, that all they have is phone calls. And there is no indication of one gram of cocaine, much less the 150 kilos that the court found that Mr. Hernando Moya was involved with. The second issue I had is regarding the venue and jurisdiction. And this has been briefed and the court is well aware of it. But they flew three of these defendants into Guantanamo Bay, Cuba. Under the extraterritorial jurisdiction of the courts, this case should have gone to the District of Columbia. And I understand what 959C says, but I don't think it's true. And the government wants to say, well, we flew them straight to where there was a district court. And they rely on a case called Harlow, which is a 1962 case. And the distinction between Harlow and what this case is, is at the time in 1957 when the defendants were indicted in Harlow, they were all in the western district of Texas. And it involved a... The Ninth Circuit and the Eleventh Circuit have both... I think it's the... Which is the decision that involved American Samoa? That seems the most appropriate here, right? Okay. I'd have to look it up. I think that was maybe the... I don't know what circuit. Probably Ninth Circuit. Ninth Circuit. So it's the Lee decision. Yeah. Why isn't that just sort of straight on point? Where if you land and refuel in American Samoa, there's no federal district there, so the statute means... Well, I think Rizul changed that, saying that... Guantanamo. But Guantanamo is less of the United States than American Samoa. A lot of people would argue differently, Your Honor. Well, Guantanamo in the context of the habeas ruling that was made... Okay. I understand. There's a United States Naval base in Guantanamo Bay. It's subject to UCMJ. It's subject to all the federal statutes. We also have a large detention facility, which has created a lot of litigation in the last 15 years. So I... Your argument is Rizul has made... There's no district court in Guantanamo. How could he be prosecuted in Guantanamo? It's not Guantanamo specifically. It says that under the extraterritorial jurisdiction of 18 U.S.C. Section 7, and what happened in the statute in 3238 requires that it be the venue is proper in the District of Columbia. And that's my argument. Does that answer your question, sir? Yeah, but I've got your answer. Okay. And so basically my argument is that the venue was improper in this case. It should have been dismissed and transferred. It wasn't. The court did not allow us to bring a venue in the trial, which was improper. We're not allowed to submit a jury argument on it or jury charge, which was improper. What's your best case that venue's evidentiary matter is distinct from a legal question? It is, but it's also a mixed question that can be submitted to the jury. And so with that, I'll reserve what time I have. Thank you. All right. Thank you. Hear from the government? Mr. Visosky? What do you do with all these inferences? Good morning, Your Honor. May it please the Court. Respectfully, this case was about a lot more than inferences. And our best case, I think the Court hit on it this morning, is the Martinez case from the DCC. But that's not actually a great case. There was a lot more there. They have a little section on 704, 702, but everything else is . . . your case here is no defendant's ever been in the U.S. No cane gets to the U.S. No wiretaps. I forget how many he said they've got, but I mean, you're talking a massive amount. No mention of the U.S. And then you've got two experts that say, well, I mean, if we allow a jury to infer from the expert testimony, there would never be a drug case in Central and South America that wouldn't violate 959, because they just say it all comes to the U.S. Well, Your Honor, it's not accurate that no defendant in this case had ever been to the United States. Defendant Cavalcante had two convictions, one in the District of New Jersey and one in the Southern District of Well, and because . . . I mean, that's verifiable. You argued that the relevance of those convictions goes to his intent and knowledge of drugs coming in the U.S.? Agent Ferguson, when he was giving his expert testimony, had testified about connections with the U.S., involvement with the U.S., and I admit it's not . . . it wasn't our strongest evidence by far. But even if that is your critical plus factor, then are you conceding insufficiency as to the others? No, absolutely not, Your Honor. So I don't think the two, four convictions for him are what . . . your best case is Martinez? Well, the one factual distinction that I think was different from Martinez was the fact that Mr. Martinez, from the factual recitation of that case, it kind of hatched the scheme in Houston, I believe. Yeah. But the court in its discussion of the evidence relied heavily on the DEA agent's testimony in that case, which was Agent Garland. And his testimony essentially mirrored Agent Ferguson's testimony in this case. That, look, and roots were the key, that cocaine that is flown to Central America before it comes to Mexico, there's absolutely no logical reason why it would go to Central America, Honduras, Guatemala, the two key countries in this case, and then go to Europe. And it doesn't make any financial sense for the cocaine to go all the way to the Zetas on the border of the United States. But that, the limiting . . . there is no limiting principle, you agree? What you've just articulated is anytime drugs travel in a plane in South or Central America, 959 makes that a federal U.S. crime because it's coming to us. It's strong evidence if you have expert testimony, but here we also had co-conspirator testimony. I know. We had people . . . That becomes crucial, but stay with me on the expert testimony. I know that Judge Kavanaugh wrote differently, but why is that not an expert opinion on the state of mind of a defendant? Because it's not testifying what . . . he's not saying what any particular defendant had in their mind. Then the government prosecutor in closing is saying infer from that evidence what his state of mind is. I don't see . . . that's a fine line. Maybe they didn't object on that basis. Well, that's a fair argument for the government to make . . . to ask the jury to make that inference, which I think is a strong inference given the facts of this case. The government argues you infer from evidence that couldn't have come in as DeSanter that they should draw the DeSanter inference? Well . . . What's the case that says you can get around 704 on that? Well, the point is . . . and Judge Crone specifically warned the government very early on before any of the testimony came in as the expert, don't ask this expert what any particular defendant knew as to . . . Right. No, it's interesting. So then instead they say all drugs come to the U.S. that travel in planes. But then in closing argument, the argument is you heard from these experts, they must have known. That's a tough one for me. Well, Your Honor . . . I guess here's my question. Did they object to the testimony under 704 that it was expert testimony as to state of mind? Did they make that objection? Not that I'm aware of, Your Honor, and it's got the co-conspirators. Correct. And we have several co-conspirators. We have Mr. Comatine, who's Amaya Nungo's stepson. He's the one that . . . Amaya Nungo, one of the main suppliers for the HP-1607 transaction that's discussed extensively in the brief, goes to Mexico to await the shipment of cocaine. And where does he stay? He stays at the home of Lopito, Saucedo Gamboa's, Alcaraz's right-hand man. And he talks about . . . and I understand that this doesn't involve directly the cocaine in this case, but he goes . . . he's staying at the house of Raul, a high-level Zetas member. Raul takes him to a friend's house where they're loading cocaine and overhears, oh, they're waiting for this over in McAllen. That's not charged cocaine. So the . . . that was offered as 404B to go to intent again? That's correct, Your Honor. And the expert testimony and the co-conspirator testimony was strong on this point. Otter Herrera-Garcia, a Sinaloa cartel member, Mario Cuellar, a Zetas member himself for many years, testified that, look, especially if it's coming to the border of the United States, that's where the money is. And the focus on the United States dollar, the defendants raised that as if it were the government's entire case. And it certainly was important. The experts talked about it as a factor. But there are two points to make with that. One, there's the issue of the currency itself. And the evidence showed that U.S. dollars were received for all of the major transactions at issue in this case, the 1607 transaction. Mr. . . . Rojas? No, no, that was . . . Rojas is, he's the truck that's intercepted in Columbia, right? Correct. So not 1607. What about, what's your best evidence as to him? Mr. Rojas? Because he seems the lowest on the chain in one way of thinking. I mean, for him, Mr. Megudan Mendez was a co-conspirator, indicted, pleaded guilty in this case to conspiring to bring cocaine, knowing or intending that cocaine would come into the United States, testified that the load from those transactions was going to go through either Guatemala or Honduras to a Mexican man named Chepa in Mexico. And El Tio was the logistics mastermind for those deals. And his large, grand scheme was to establish a network from Columbia to Central America to Mexico for what? For, obviously, to bring it into the United States because that's where the big money was. And Mr. Rojas was not just a truck driver. He was an important member of that, of those transactions. One, he was trusted enough to house half the cocaine load at his house, waiting on word from El Tio to bring it where? To an airstrip where it could be loaded and flown to Guatemala or Honduras and then to Mr. Chepa in Mexico. And going back to the other defendants, Mr. Moya, there were several pieces of evidence that implicated him. One, as the court talked about earlier, he was very close with kind of Carlos Gaitan and he died in a plane crash, was not able to come to trial. They had their own code language which signals a close relationship, not only with Mr. Gaitan but also with David Quinonez, who was Mr. Gaitan's brother-in-law and was also another key figure in the organization. The November 18, 2007, 27 phone calls, Mr. Moya is heard directing a flight to go where to on Honduras, which again, Central America, showing intent, knowledge or intent that the cocaine will be imported into the United States. And finally, Agent Ferguson testified that the phone calls on December 11 and 12 from Mr., between Mr. Moya and Mr. Gaitan involved the movement of HP 1607 back and forth. And again, that was only nine days before that plane was intercepted. I'm guessing when they say you agree that none of these defendants knew, well, does the record reflect that any of them were ever told that U.S. dollars were being paid for the drugs? There was actual co-conspirator testimony for the HP 1607 transaction that U.S. dollars were counted. Right, but my question is, were any of the defendants, you know, represented at this table ever told that this drug, these drugs were being paid for in U.S. dollars? Mr. Cabalcante, I believe when he gave his, you know, confession of knowledge, but he talked with the DEA agent about his involvement with the transaction, I believe testified that it was a $7.9 million deal. Well, related question to that then, were any of the others, other than Cabalcante, aware that the Zetas were the original purchasers? Or aware that Cabalcante had gone to the border of the U.S. Mexico? Were any of the others represented at this table aware of those facts? For Mr. Moya, there was no specific evidence of that. And part of the reason for that is because the logistics masterminds, the evidence was that they kept their air traffic controllers very close to their vest. They didn't like to disclose the names. So, there was no specific evidence that he was aware of U.S. dollars. Same for Mr. Pineda and Mr. Rojas. But there was co-conspirator testimony for the Rojas transactions that U.S. dollars were involved as for the 1607. One thing about the jury note that was brought up originally, one, that isn't an issue for appeal. It wasn't brought up. It wasn't briefed. And the judge correctly instructed the jury, based on the language of the statute, that to convict a defendant, you had to show that they intended or knew that the cocaine was intended or destined for the United States. And from the Perez-Herrera case of this court, I believe it's 1979 or 1980, it makes clear that the cocaine never has to enter the United States. It doesn't have to be a successful transaction. That even attempts to bring cocaine into the United States is an injury to the state. And it talked about the calendar of the court, shows that attempts such as this do injure the state because law enforcement is diverted. I guess my last question on sufficiency is, what's your limiting principle? When wouldn't an airplane flight involving narcotics anywhere in South America and Central America, not under your theory of the case, meet the Center? Because anyone involved with flights in South America know that it's going to the U.S. What's your limiting principle? Well, you have to have, one, involvement in the overall organization. And that's where you get into, that's what distinguishes the Londona BIA case. And that is a case where a limiting principle would apply. It was a lower level member, wasn't involved in the organization that was involved in that case. All the evidence showed was that he was a guide for a pilot to get from Columbia to Panama, which didn't involve Central America. So I would say, I'm not prepared to say that expert testimony alone would be enough. But here you have expert testimony, co-conspirator testimony, and the wiretap conversations that make clear, obviously they're smart, they don't talk about the cocaine going to the United States, but make clear that the cocaine was going to Central America. For example, you have Mr. Pineda, Agent Ferguson testified that in some of those conversations, he was estimating the mileage from Columbia to the outer limits of Guatemala, Honduras, and Mexico. So I would say in this case... Any time drugs can be shown to be transported to Central America, you can draw an inference that it was with the intent that those drugs ultimately come to America, to the exclusion of all the other countries in the world? Well, what the co-conspirators testified to, and the DEA experts testified to, or the DEA expert, Agent Ferguson, testified essentially that, yes, if it's going to Central America, there's no reason for it to go to Europe. And Otto Herrera-Garcia and Mario Cuellar were cross-examined hard on that element. And the counsel tried to get them to admit that, well, it's possibly it could have gone to Europe, and they stood fast and said no. So, and again, here we don't have just the transport, or the planned transport to Central America. We have co-conspirator testimony, conspirators that pleaded guilty. In this case, again, there were 27 defendants. Several of them testified at trial that, yes, I was coming to the United States. So. Those are co-conspirators. I'm, I'm sorry, Your Honor. Those are co-conspirators who are saying that. A record site for that proposition would be helpful. We knew all the drugs in this conspiracy was going to the United States? Correct, Your Honor. Vasquez Angel was an indicted co-conspirator who had dealings with Pacho Cifuentes, which was a major cocaine drug supplier. David Quinonez and David, and Carlos Gaitan, he testified to that. I don't have a record site, but it is, his testimony is discussed in the brief. Victor Estupian was not indicted in this case, but as we explained in the brief, because the indictment charged those known and unknown, he was one of the unknown ones, he testified that we're all aware, people that are in this, in this business know that he's coming to the United States. But they all use the same expression, which is, and I'm quoting Angel, I exported out of Colombia all the drugs that all the people, all the traffickers I know export drugs from Colombia, ends up in the United States, but then the next sentence is, but I don't know any of these four defendants. Oh. So that's not saying, what's not saying this conspiracy, the defendants in this conspiracy knew it. It's just saying everything I ever did goes there. Well, it does to an extent, Your Honor, because he's saying he didn't know these particular four defendants, but he knew and worked with Paccho Cifuentes, who was the owner of the Airstrip for the 1607 transaction. He knew and worked with David Gaitan, who was kind of the central figure in everything, and David Quinonez, who was the brother-in-law of David Gaitan. And it's important to point out that this was a sophisticated, far-reaching organization. So just because... Well, we have all that argument, but a second ago you said, co-conspirators said the drugs in this conspiracy were, they, we knew it was going to the U.S., and I don't think you've got a record site for that. Well, Vasquez, Angel, was charged in this conspiracy and pleaded guilty. So by virtue of his guilty plea, he admitted that the cocaine in this conspiracy, being a charged co-conspirator, was intended or known to come to the United States. And Mr. Estupian, as I mentioned, was not charged in this conspiracy, but he also testified to that. Otto Herrera-Garcia was not charged in this conspiracy, but again, he testified that he knew the key players, again, Mr. Cifuentes, David Gaitan, Carlos Gaitan, and David Quinonez. Well, okay. Angel gets on the stand and says, I pled guilty in this case, that you can't then draw on and argue to the jury. Well, therefore, anybody else affiliated with the conspiracy is guilty of the same scienter. Just the fact that he admits to scienter doesn't show they had the scienter. Well, I don't think that that was argued, Your Honor. Okay, so, but that's what you just said. So what I want is a record site where he said what you said to me earlier, that everybody in this conspiracy knew the drugs were going to the U.S. If you don't have the site, then that's fine. Then you're arguing about organization and dollars and structure and flights. But if you have a co-conspirator saying we all knew, then you need a record site for that, because that makes the case very much stronger. For Mr. Vazquez, it's on page 2995 of the record. No, I'm sorry, 3005. He's saying all, and again, Mr. Vazquez was an indicted co-conspirator, pleaded guilty in this case. He's saying all the drugs that go out of Colombia, either to Central America or Mexico, ends up in the United States. Okay. And he also testified that he flew personally to Guatemala and Honduras, because that's where Pachos Fuentes, the owner of the 1607 airstrip, had clandestine airstrips. And he also knew and testified that Carlos Gaitan and David Quinonez, what they did is they organized cocaine loads from Colombia to Central America to the United States, and that's at 2944 of the record. And he also testified that David Quinonez and Carlos Gaitan bought planes in the United States, and that's also at 2994. What's this, moving to the Fourth Amendment issue, what's the government, what aspect of the District Court's ruling would you be asking us to affirm? That post-Verdugo they don't have standing? A Colombian who has no substantial connections to the United States has no standing to object, period? I think that's all you need to get to, Your Honor. Okay, so what if you do have joint action and you have shock the conscience? I guess I'm wondering, is it the government's position that Verdugo has essentially overruled our Heller and Hawkins line of authority? There aren't those exceptions anymore? Yeah, I looked back at the Verdugo, at the Verdugo-Urquidez opinion to see if it mentioned shock the conscience. I didn't see that it did. I don't know, in a future case, and I know it's kind of a hypothetical, but I'm just not aware if there is any limiting principle on that. I can say that in this case, assuming that there was a limiting principle, this search, and again, as we pointed out in the brief, they never really identified what the Fourth Amendment violation was. But in this case, it doesn't get near shocking the conscience because the evidence showed that the Columbians were the ones that . . . So you would say, no standing to make the objection. The District Court's final ruling was the best . . . Correct. By the third time that she addressed the issue, I think she picked up on that decision and that that was correct. I think that's as far as the Court needs to go. Unless the Court has any further questions, I'll just rest my brief for the remainder of my time. Thank you. All right. There are three people who want to do rebuttal. Mr. Jacobson, I think I can give you some of the record size that Mr. Vasosky wasn't able to get. Obviously, you don't have time to get all of them, but the testimony of Otto after he gave the perfunctory testimony, this macro level, all drugs go to the United States, he testified he didn't know Mr. Cavalcante. He didn't know any of the other folks. Gomez Gonzalez, 2646 is my record size. Same thing. He didn't know anybody. He even asked, when did you meet these co-defendants, the people sitting at this table? He said, the day I walked into the courtroom. Same thing with Vasquez and Hill, ROA 2987. Judge Higginson, my notes on this are very much like I assume the notes you have there, which is exactly this question, which was, you know, what knowledge do you have of these people at this table or of this particular cocaine? And every one of them said, I don't. In that way, Judge Higginson, their testimony was almost identical, logically, coextensive, with that with the very first witness the government called in this case, which was a McKinney or local police officer of some kind who admitted he'd never been out of the country. And he also testified, I know that cocaine comes from South America, so it necessarily comes up here. That might be true at some macroeconomic level that a lot of cocaine, of course it does, comes from South America. The problem is that the government is still required to show beyond a reasonable doubt that each individual defendant had that cianter. And Judge Higginson— The problem is the jury was told that they had to find that, and the jury made the finding. And so it's extrapolating from these cartels are designed to have deniability, and so you look at the fact that dollars are being used to pay, you have an extremely complex international travel, and from that, experts testify, no objection under 704B, that they would all have known. Of course, Judge Higginson, my first answer to your question is that yes, of course our argument is no rational juror could reach this conclusion. I don't doubt that the jury did reach it. But from that assembly of facts, not just dollars, all those various things together, coded language, one of the co-conspirators going up to the border, why isn't that enough to just draw the inference? I don't think it is, because, Judge, there's a difference between, in a circumstantial case, of course the government can rely on a series of inferences. It's a problem when the inference is embedded with the other inference. It's like a theory of second best analysis. What's the best 959 case where a circuit court reversed a jury finding on that theory of inference on inference? It just doesn't exist, does it? Now, you may think that we're turning, you know, federalizing all drug trafficking offenses in Central and South America, but you'd think there'd be a case that would warn about that. Well, you know, Judge, I don't know the simple fact that—I don't know how often—empirically, I don't know how often the government charges 959 versus other narcotics crimes. I don't know how often they've, you know, there's been no connections. We cited in our brief almost all these other cases have had maps or compasses or so forth. So putting that aside, the simple fact that this might not have been as heavily litigated doesn't mean that the issue before this Court is any different. Speaking of 959, Judge Higginson, I found Mr. Vysotsky's answer fascinating. When you asked him a very simple question, what narcotics movement in South America is now not susceptible to prosecution here in the United States, and he said, oh, well, you'd have to be part of a big organization. I was like, really? I mean, that's not a conspiracy account. Now, are you saying that 959 necessarily has to be appended to a conspiracy? A conspiracy can be just two people. Where does that rule come from that has to be part of a big organization? These are simply rules that seem to me to be kind of made up on an ad hoc basis as they go to try to tether the testimony in this case around—the government's reach exceeds its grasp here, but they could not answer— Is it your position that all the co-defendants needed to know one another because you said you seemed to be going back to the fact that there was testimony that they did not know? Oh, no. Judge Coleman, I apologize if I misspoke. No, of course not. Co-conspirators don't need to know the names of other co-conspirators. It's our position that if any witness, no matter if it's a co-defendant or not, has to—is going to get on the stand and say that there was—if they're going to testify such that a rational juror could infer intent to import into the United States, they would either have to know that individual or something about the cocaine at issue. If they don't know that individual or know nothing about the cocaine— Something about the overall scheme. I'm sorry, what? Something about the overall scheme. They don't have to know the individual players. That's correct, yes. There's just different variations on the theme. Yes, if they don't know, one, the individual, two, anything about the cocaine, three, what these people were doing, then their testimony, whatever it may be, if the government wants to call it expert or anything else about macroeconomic principles regarding international drug trafficking, it does nothing to tell you how any—what these individuals did such that a rational juror could infer that essential criminal intents see interest to each one which has to be proved beyond a reasonable doubt. All right. Thank you. May it please the Court. My name is Brian Newman and I, along with Todd Durden, represent Mr. Rojas in this case. In rebuttal, I wish to address two issues. First, I'd like to talk about the concept of U.S. currency being used to infer specific intent to import into the United States. In its brief, the government has cited two cases towards this principle, the Romero-Padilla case and the Trujillo case. In Romero-Padilla, there are substantial other facts that were not present in this case. Like our case, there was expert testimony. But in addition to this, Romero-Padilla stated to a co-defendant that he intended to import cocaine into the United States. He stated to that same co-defendant that the person who organized the conspiracy had intended to import cocaine into the United States because he'd done it before. He'd stated to several co-defendants that he was concerned that DEA was involved. And unlike the appellants in this case, he personally handled U.S. currency on multiple occasions as part of that conspiracy. Further, the Trujillo case is a plea. And as part of that plea, there was a factual resume entered. And in that factual resume, he stated that he knew the cocaine was coming to the United States, Mr. Trujillo did. Further, there was a proffer of a witness. And that witness would have testified that because U.S. currency was used, they knew the cocaine was coming to the United States. And when asked about it, Mr. Trujillo said, yes, your honor, that's correct. The plea was accepted. And then he was punished. Those facts are not present in this case. Further, I'd like to just briefly address the status of American Samoa. I understand that this relates to the venue argument. And the important thing that I'd like to note is American Samoa is different than every other U.S. territory. In that, people who are born there are not U.S. citizens. They're U.S. nationals. This is a product of our insular doctrine. And because of that, the rights are different for people who reside in American Samoa than Guam, Hawaii, the Virgin Islands, and even people who are at Guantanamo Bay. And I see my time has expired. Thank you. Mr. Bale, you have the last minute. Thank you, your honor. Just to clarify a few things. First of all, the government said David Kiyonis testified. He never testified in this case. I tried to get him there. They wouldn't let me know where he's at. With regards to Mr. Gaitan. I tried to get him there. They wouldn't let you know where he's at. Did you ask the court? Did you ask for a statement? I asked the court to order them. The court ordered them to give me his attorney's name. They gave me an attorney's name in Columbia who had no idea where he was. At the end of the trial, I found out he was in the Eastern District of Texas, but they wouldn't tell me where he was at. So I couldn't get him served. He was on their witness list, but he didn't testify? He did not testify. So you could have called him? I couldn't call. I tried to. You could have asked for a subpoena. I asked for a subpoena. Yes, I did. What happened? The court didn't issue a subpoena? The subpoenas were issued, but I couldn't get him served. Well, if you list a witness on your witness list, which the government did, then they're responsible to the court to produce those witnesses. There was other witnesses, such as Mr. Beltran, that they said would testify, that never testified, that I had on my witness list and they wouldn't produce it. The court did not allow it. All right. Now, with regards to Mr. Gattan . . . Your time's up, but I have one question. Was there an objection to either the experts based on 704B? Did anybody object saying this is state-of-mind testimony through  I objected to . . . there was sixty-four . . . I'm asking you a very specific question. Did you object on that basis, yes or no? No.  Thank you.